**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:25-cr-00129 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| KYLE CHAMBERS | ) | May 14, 2026 |
| | ) | |
| | ) | |

**MEMORANDUM OF DECISION**
**RE: DEFENDANT'S MOTION TO SUPPRESS (ECF NO. 24)**

Kari A. Dooley, United States District Judge

On August 7, 2025, a federal grand jury returned a six-count indictment against Defendant Kyle Chambers ("Defendant"), charging him in Count One with Conspiracy to Commit Firearm Trafficking in violation of 18 U.S.C. § 933(a)(1) and (a)(2); in Count Two and Three with Unlawful Possession of a Machine Gun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2); in Count Four and Five with Possession of an Unregistered Machine Gun in violation of 26 U.S.C. §§ 5841, 5845(b), 5861(d), and 5871; and in Count Six with Possession of an Unregistered Firearm Muffler/Silencer in violation of 26 U.S.C. §§ 5841, 5845(a)(7), 5861(d), and 5871. Pending before the Court is Defendant's motion to suppress all evidence seized from his residence following the execution of two search warrants, and the evidence extracted from Defendant's cell phone following the execution of a third search warrant. Finally, Defendant seeks to suppress statements he made to law enforcement following the search of his residence.

Defendant argues, *inter alia*, that the initial search warrant was not supported by probable cause, and that the affidavit submitted by the FBI to the magistrate judge was recklessly or intentionally false. Defendant thus seeks an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge the probable cause finding and the reliance on the affidavit. The

1

Government opposes the motion as well as the request for a *Franks* hearing.  For the reasons that follow, the motion is DENIED, and no hearing is necessary.

**The First Warrant**

On December 31, 2024, at approximately 4:37 p.m., Magistrate Judge Richardson issued a search warrant for the Defendant's residence in Granby, Connecticut (the "Residence"), authorizing the seizure of, *inter alia*, "[d]estructive devices, including grenades, claymores, landmines, [and] 40mm artillery," along with items relating to or in furtherance of unlawful possession of these destructive devices.  Def.'s Ex. A ("First Warrant"), ECF No. 24-2, at Attach. B.  FBI Special Agent Corbett Tomsovic provided the affidavit in support of the First Warrant (the "Affidavit").  Tomsovic Aff., ECF No. 24-2, at pp. 5–10.  Special Agent Tomsovic explained, *inter alia*, that the Defendant had been identified as a subject of interest as a result of a "review of records, conversations with previous significant other, and guardian leads from New Haven Ops Center originated from [the National Threat Operation Center (NTOC)] and two [New York Police Department (NYPD)] tips sent to Granby Police Department."  Tomsovic Aff. ¶ 7.  Special Agent Tomsovic provided information about Defendant's background, to include that he was a K9 dog handler who worked at JFK International Airport in New York, but that he was recently terminated from that position.  *Id.* ¶ 10.  He averred that Defendant had a permit to carry explosives through that position, but it had recently been revoked.  *Id.*

Special Agent Tomsovic stated that the NTOC and NYPD had received "multiple tips" about the Defendant, alleging that he "possess[ed] firearms, explosives and was going to use them."  *Id.* ¶¶ 9, 12. The first tipster sent a tip to the NTOC and stated that Defendant had explosives at the Residence and intended to use them on December 31, 2024.  *Id.* ¶ 9.  The first tipster left a phone number that was not in service.  *Id.*  A second tipster, whose tip was sent to the

NYPD, contained "what appeared to be a screen shot from a Facetime call," depicting a "white male holding what appeared to be a 40 mm grenade.  The number '860-418-9963' could be observed in the photo as well," which investigators identified as belonging to the Defendant.  *Id.* ¶ 12.  After receiving these tips in late December 2024, Special Agent Tomsovic interviewed the Defendant's previous significant other.  She indicated that Defendant "suffers from personality disorder," that he had not been taking his medications, and that he was "absolutely" capable of harming others.  *Id.* ¶ 11.  She also stated that the person seen in the image provided by the second tipster appeared to be the Defendant, and the location in the background of the image appeared to be the Residence.  *Id.* ¶ 13.

**The Second Warrant**

On the basis of Special Agent Tomsovic's affidavit, Judge Richardson signed the First Warrant on December 31, 2024, at approximately 4:30 p.m.  *See* First Warrant.  Later that same day, law enforcement executed the First Warrant at the Residence and shortly thereafter filed an Application for a second, expanded warrant.  *See* Gov't's Ex. 2 ("Second Warrant"), ECF No. 41-2.  Special Agent Tomsovic provided a supplemental affidavit in support and averred that he believed that they had identified evidence of firearms trafficking during the search of the Residence pursuant to the First Warrant.  Tomsovic Suppl. Aff., ECF No. 41-2, at 6–16.  Specifically, law enforcement officers discovered "a number of prohibited firearms, which appear[ed] to have been modified for fully automatic fire, as well as numerous suppressors and a 3d printer."  *Id.* ¶ 23.  They also located apparent machine gun conversion devices.  *Id.* ¶ 25.  Judge Richardson signed and issued the Second Warrant on December 31, 2024, at 10:54 p.m.  *See* Second Warrant.

**The Seized Evidence**

While searching the Residence, law enforcement seized multiple firearms, explosives, and other associated items. *See* Warrant Returns, ECF No. 41-4. Following the execution of the warrants for the Residence, law enforcement sought and obtained an additional search warrant for the Defendant's phone. Officers also interviewed the Defendant at the Granby Police Department. *See* Granby Police Report, ECF No. 43-1 (SEALED).[1] Detective Danny Macaulay advised Defendant that he was not under arrest but also read him his *Miranda* rights and provided a Notice of Rights document, which the Defendant signed. *Id.* at 1; *see* Gov't's Ex. 6, ECF No. 41-6. At one point during the interview, Defendant indicated he wanted a lawyer. *See* FBI Report, ECF No. 43-2 (SEALED), at 2. The interview ended. However, while exiting the interview room, Defendant said he wanted to keep talking, and law enforcement officers resumed the interview. *Id.* Defendant was provided a second Advice of Rights form, which he also signed. *Id.*; *see* Gov't's Ex. 8, ECF No. 41-8.

**The Fourth Amendment**

The Fourth Amendment of the United States Constitution prohibits "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The chief evil that prompted the framing and adoption of the Fourth Amendment was the 'indiscriminate searches and seizures' conducted by the British 'under the authority of general warrants.'" *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir.

---

[1] To the extent the Court cites to and reveals information previously sealed, those cited portions of the sealed matters are simultaneously hereby unsealed, as necessary and important to the Court's deliberative and adjudicative process in deciding this motion. *See, e.g.*, *United States v. M/Y Amadea*, No. 23 Civ. 9304 (DEH), 2025 WL 754124, at *5 n.6 (S.D.N.Y. Mar. 10, 2025) (citing *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140–42 (2d. Cir. 2004)); *Eagle Star Ins. Co. v. Arrowood Indem. Co.*, No. 13 Civ 3410, 2013 WL 5322573, at *1 (S.D.N.Y. Sept. 23, 2013)).

2013) (quoting *Payton v. New York*, 445 U.S. 573, 583 (1980)).  "To prevent such general, exploratory rummaging in a person's belongings and the attendant privacy violations, the Fourth Amendment provides that a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity."  *Id.* (internal citations and quotations omitted).

"To be lawful under the Constitution, a search warrant must, *inter alia*, set forth evidence establishing probable cause to believe a crime has been committed and that evidence of that crime can be found in what is to be searched."  *United States v. Weigand*, 482 F. Supp. 3d 224, 240 (S.D.N.Y. 2020).  "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  Although the probable cause standard "does not demand 'hard certainties' . . . it does require more than a 'hunch.'"  *United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (quoting *Gates*, 462 U.S. at 238, and *Terry v. Ohio*, 392 U.S. 1, 22, 27 (1968)).  Therefore, "[i]n determining whether probable cause exists to support the issuance of a warrant, a judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Boles*, 914 F.3d 95, 102 (2d Cir. 2019) (cleaned up).  This decision "must be grounded in sufficient facts to establish the sort of 'fair probability' on which 'reasonable and prudent men, not legal technicians, act.'"  *Lauria*, 70 F.4th at 128 (quoting *Gates*, 462 U.S. at 231, 238, 241).

Finally, "after-the-fact scrutiny by courts of the sufficiency of an affidavit [applying for a warrant] should not take the form of *de novo* review."  *Gates*, 462 U.S. at 236.  "A magistrate's determination of probable cause should be paid great deference by reviewing courts."  *Id.*  Thus,

"[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

### *Franks* Hearing

As set forth in *Franks v. Delaware*, a defendant may "challenge the veracity of a sworn statement used by police to procure a search warrant." 438 U.S. at 155. If, after a hearing, "the allegation of perjury or reckless disregard [for the truth] is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded." *Id.* at 156. However, when a *Franks* motion is filed, the Court will convene a hearing on the motion only if "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, *and* if the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155–56 (emphasis added); *see United States v. Thomas*, 788 F.3d 345, 349 n.6 (2d Cir. 2015).

Thus, if the disputed information is not material or necessary to the ultimate finding of probable cause, a *Franks* hearing is unnecessary. *United States v. Osborne*, 739 F. App'x 11, 16–17 (2d Cir. 2018) (summary order) (affirming denial of *Franks* hearing concerning wiretap and search warrant applications where erroneous information "was neither material nor necessary to an ultimate finding of probable cause"); *United States v. Aguiar*, 737 F.3d 251, 263 (2d Cir. 2013) (same, as to pen register and trap and trace warrant). To determine whether the disputed information is "material," a court must extract the alleged falsehoods from the application and

determine whether the remaining portions of the application support a finding of probable cause. *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013).  When the *Franks* challenge involves alleged omissions rather than affirmative false statements, the inquiry is "governed by the same rules."  *United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir. 1985).  As such, a court must "determine whether, if the omitted material had been included in the affidavit, the affidavit would still establish probable cause."  *Rajaratnam*, 719 F.3d at 146.

**Discussion**

> The First Warrant

Defendant seeks the suppression of all the evidence seized in this case on the grounds that the First Warrant was not supported by probable cause, and that each of the subsequent warrants flowed from the faulty First Warrant.  Def.'s Mem., ECF No. 24-1, at 3.  Upon review, the Court concludes that Special Agent Tomsovic's Affidavit provided a substantial basis for a finding of probable cause to issue the First Warrant to search the Defendant's Residence.

The Affidavit offers a composite of multiple pieces of evidence to support a finding of probable cause.  The Affidavit explains that law enforcement received an anonymous tip from someone claiming that Defendant had explosives at the Residence in a storage compartment, including "claymores, landmines, 40mm artillery and more," as well as frag grenades, and that Defendant intended to use them on December 31, 2024.  *Id.* ¶ 9.  The first tipster specified where the illegal explosives were allegedly being held, what types of explosives they were, and a date on which Defendant allegedly intended to use them.  Law enforcement also received a second anonymous tip which supported and corroborated the first tipster's account about Defendant's alleged possession of illegal explosives and his intent to use them.  The second tipster also provided an image of a screenshot from a Facetime call, showing a white male holding a 40mm grenade.

*Id.* ¶ 12.  The Affidavit also noted that on that screenshot, a phone number "could be observed" as well, and that the phone number belonged to the Defendant.  *Id.*

After receiving these anonymous tips, Special Agent Tomsovic confirmed that Defendant, by virtue of his job working security at JFK International Airport, had been provided a permit to possess explosives but that he had recently lost this job.  Thus, if Defendant currently possessed such explosives, he would be in violation of the law.  Tomsovic Aff. ¶ 10.  In addition, Special Agent Tomsovic interviewed the Defendant's former girlfriend.  She stated that the Facetime screenshot appeared to be of the Defendant and appeared to be taken in the Residence.  She further indicated that Defendant had a personality disorder, had not been taking his medications, and was "absolutely" capable of harming others.

Defendant first argues that the two anonymous tips are insufficient to support a finding of probable cause.  This argument is fatally flawed because, as discussed above, law enforcement's investigation, and therefore the search warrant application, did not begin and end with these anonymous tips.  After receiving these tips, law enforcement contacted the Defendant's girlfriend, to try to corroborate the information received in the tips.  She claimed that Defendant suffered from a "personality disorder," and that he had not been taken his medication for several months.  *Id.* ¶ 11.  When asked whether Defendant was "capable of harming individuals," she stated "absolutely."  *Id.*  She also confirmed that he had access to training material through his job, and she identified the man in the second tipster's screenshot as the Defendant, and the location of the screenshot as the Residence.  *Id.* ¶¶ 11, 13.

8

In sum, between the independent tipsters' information and the corroborating information obtained, the totality of the circumstances presented afforded Judge Richardson a substantial basis to find probable cause to search the Defendant's Residence.[2]

*Franks* Analysis

Defendant also argues that the Court should hold a *Franks* hearing to test the validity of the probable cause determination in light of purported falsehoods or omissions in the Affidavit. The Court is not persuaded.

First, Defendant argues that the Affidavit was misleading because it uses the term "multiple" anonymous tips, when there were only two. Defendant argues that the term "multiple" means "many," in "common American usage," and in any event, at least more than two. Def.'s Mem., ECF No. 24-1, at 6. The Government responds that, by definition, the word "multiple" means "more than one," which was, in fact, accurate. *See* Gov't's Mem., ECF No. 41, at 11. The Affidavit was therefore neither false nor misleading. But even if the Court were to accept that the use of the word "multiple" was misleading, or perhaps that a better practice would have been to say "two" rather than "multiple," the distinction was not material to a finding of probable cause. The information that supported the probable cause determination was not the *number* of tips that were received, it was the *content* of the tips, and the corroboration of those tips that law enforcement's investigation revealed. "Anonymous tips suffice to establish probable cause if they are corroborated by independent police work." *United States v. Fama*, 38 F. App'x 70, 72 (2d Cir. 2002); *see also Ray*, 541 F. Supp. 3d at 386 ("[E]ven 'anonymous tips' from the most unsavory types, particularly when supported by corroborative police work, can establish probable cause."). Thus, it is completely immaterial how many anonymous tips there were: two anonymous tips,

---

[2] Indeed, even under *de novo* review, the Court concludes that the Affidavit supported a finding of probable cause to search the subject premises.

which were consistent with each other, combined with the corroboration provided by Defendant's previous significant other and the information about Defendant's job and background uncovered by law enforcement, were sufficient for a finding of probable cause. *See Fama*, 38 F. App'x at 72 ("In this case, the anonymous tips, combined with corroborative police work, provided [a] substantial basis.").

Defendant next argues that the Affidavit's statement that Defendant's phone number "could be observed in the photo," was misleading because he did not disclose that the tipster doctored the image by adding the phone number. *See* Tomsovic Aff. ¶ 12. Again, as with the issue regarding the number of tipsters, the Affidavit was technically accurate: the phone number "could be observed" on the image, and the Affidavit was silent as to the origin of the phone number on the image. But even if the statement could be considered misleading to the extent it overstated the probative value of the phone number on the image,[3] the omission was also not material to a finding of probable cause. The Affidavit makes clear that, regardless of the source of the phone number on the image, law enforcement confirmed that the phone number was, in fact, the Defendant's. And even if the information about the phone number's origins would have created some question about the tipster's reliability, any such concern was adequately overcome by the information received from the original tipster when combined with the significant other's report that the image *appeared to be the Defendant and appeared to have been taken in the Residence*.[4]

The Defendant next takes issue with purported inconsistencies between the previous significant other's statements as contained in the Affidavit on the one hand, and the Granby Police

---

[3] If, for example, the Affidavit included a statement that the tipster himself added the phone number, its presence on the photo is no more probative than the tipster's other information. If, however, the Affidavit is understood to mean that the presence of Defendant's phone number on the image independently tied the Defendant to the Facetime image, it might be misleading as to its probative value.

[4] Further, Defendant's argument that the presence of the phone number on the image served to inform the significant other's identification is unsupported speculation.

Report on the other.  Special Agent Tomsovic personally interviewed the former significant other. In the Affidavit, Special Agent Tomsovic includes details of that interview: that she told him that Defendant has a "personality disorder," had stopped taking his medication, and that he is "absolutely" capable of harming others.  Tomsovic Aff. ¶ 11.  The Granby Police Report (written by someone who was not privy to the conversation) summarizes the call between Tomsovic and the significant other, indicates that she told Tomsovic that Defendant had stopped taking his medication and was "mentally deteriorating," and that "she believes he is mentally unstable at this point and capable of hurting someone."  Def.'s Ex. F at 10.  As an initial matter, it is a stretch to suggest that the two versions of this conversation are inconsistent.  Are they identical?  No.  Do they convey the same assessment?  Yes.  Further, the Granby Police Report is a summary of what someone else told the report's author.  It contains no direct quotes attributable to the significant other.  Special Agent Tomsovic, on the other hand, is reporting first-hand what she said, and in doing so, he does identify direct quotes from his interview of her.  It is therefore perfectly consistent that the summary of the conversation in the police report does not match Special Agent Tomsovic's direct averments in the Affidavit.  *Cf. United States v. Gigliotti*, No. 15-cr-204 (RJD), 2016 WL 3647618, at *9 (E.D.N.Y. June 30, 2016) (failing to find any misrepresentation where two reports differed but the agent in the affidavit "did not purport to quote the statement verbatim").  And, as discussed above, the Court agrees with the Government that, for all intents and purposes, there is "no daylight between these two statements," Gov't's Mem. at 14.  To be sure, there is no evidence that these statements by Special Agent Tomsovic were either false or misleading.

Defendant next argues that the Affidavit omitted crucial information by not including that the first tipster told law enforcement that he had not seen the Defendant in person since

11

approximately one month prior.  Specifically, the FBI Report notes, in relevant part: "As recent as November 24, 2024, [the tipster] observed CHAMBERS in person, in possession [of] firearms and a 40mm tank grenade."  Def.'s Ex. G at 1.  While it likely would have been better practice to include this information in the Affidavit, as it could impact Magistrate Judge Richardson's assessment of the likelihood of the contraband still being present at the target location, the omission, even had it been included, does not undermine the finding of probable cause.  The corroboration of the first tipster's account by a second tipster, by the Defendant's previous significant other, and by the Government's own independent investigation, was sufficient to support a finding of probable cause, even if the omitted detail had been included.  *See United States v. Mazella*, No. 11-cr-300 (CBA), 2011 WL 13128202, at *1 (E.D.N.Y. Aug. 9, 2011) ("Although . . . such information should have been included in the affidavit, the Court agrees with the government's position that the omission does not require a *Franks* hearing" because "many of the witness's statements were corroborated by other sources cited in the affidavit, and even if the references to Witness #1 were removed from the affidavit, the additional information contained in the affidavit would have been sufficient to support a finding of probable cause.").

Where there are either false or misleading averments or material omissions, Defendant must also establish that the affiant acted knowingly or with reckless disregard for the truth.  *United States v. Powell*, 634 F. Supp. 3d 48, 52–53 (E.D.N.Y. 2022) (citing *Franks*, 438 U.S. at 155–56). On this issue, even though the court has above determined that the Affidavit was neither false nor misleading, by omission or otherwise, Defendant does not provide any evidence, other than conclusory accusations and speculation, that Special Agent Tomsovic acted with the requisite *mens rea* in fashioning the Affidavit.  This alone is a basis to deny Defendant's motion for a *Franks* hearing.  *See United States v. Ray*, 541 F. Supp. 3d 355, 386 (S.D.N.Y. 2021) ("Finally, even if

12

the information omitted from the CSLI Search Warrant Affidavit were material, [Defendant] has made no showing—much less a substantial preliminary showing—that SA Maguire intentionally misrepresented the facts or entertained serious doubts as to the truth of her allegations." (quotation and alteration omitted)); *see also United States v. Mathews*, 841 F. App'x 295, 300 (2d Cir. 2021) (summary order) (finding district court did not err in denying *Franks* hearing where, other than counsel's speculation, "there is no indication of an intent to deceive or reckless disregard for the truth").

For all of the foregoing reasons, Defendant has failed to show that he is entitled to a *Franks* hearing in order to challenge the validity of the probable cause determination as to the First Warrant. Because the First Warrant was valid and supported by probable cause, the Second Warrant (obtained on the basis of the evidence of explosives seized at the Residence, pursuant to the First Warrant) was also clearly supported by probable cause, as was the search warrant for Plaintiff's cell phone. Thus, the Defendant's Motion to Suppress the evidence seized is DENIED.

Motion to Suppress Statements under *Miranda*

Defendant also moves to suppress statements he made at the Granby Police Department on the grounds that (1) those statements were "fruits of the poisonous tree," insofar as they stemmed from an illegal search, and (2) the statements were obtained in violation of *Miranda*. Because the Court has already determined that the searches were not illegal, the first argument fails. The Court addresses Defendant's *Miranda* argument below.

"The Fifth Amendment guarantees that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" *New York v. Quarles*, 467 U.S. 649, 654 (1984) (quoting U.S. Const. amend. V). In *Miranda v. Arizona*, the Supreme Court took steps to protect this guarantee by recognizing that "custodial interrogations, by their very nature, generate 'compelling

13

pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely,'" and by "impos[ing] on the police an obligation to follow certain procedures in their dealings with the accused." *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)).  The purpose of *Miranda*'s procedural obligation—the requirement to provide the well-known *Miranda* warnings before commencing a custodial interrogation—is "to ensure that the person in custody has sufficient knowledge of their constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *See United States v. Capers*, 627 F.3d 470, 474 (2d Cir. 2010) (quoting *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007)).  Here, although law enforcement officers first told Defendant that he was not under arrest, they nevertheless read him his *Miranda* rights at the beginning of the interview.  *See* Gov't's Ex. 5, ECF No. 43-1, at 2 (SEALED). Therefore, assuming without deciding that Defendant was subjected to a custodial interrogation, the relevant inquiry is whether the Defendant was given his *Miranda* rights, and, if so, whether he knowingly, intelligently and voluntarily waived those rights.

According to the Granby Police Department and FBI reports, Detective Danny Macaulay stated that he read the Defendant his *Miranda* rights at around 6:45 p.m.  *Id.*  Defendant verbally said that he understood, after which, police gave him a Notice of Rights form to review, which he signed.  *Id.*; *see* Gov't's Ex. 6, ECF No. 41-6.  He does not assert otherwise.  During the interview, Defendant stated that he wanted a lawyer, which signaled the end of the interview.  But upon exiting the interview room (consistent with the interview being concluded), he began speaking with the officers again.  Gov't's Ex. 7, ECF No. 43-2, at 3.  At that point, the officers gave him an FBI Advice of Rights form to review, which he also signed.  *Id.*; *see* Gov't's Ex. 8, ECF No. 41-8. Again, Defendant does not dispute this series of events but merely argues that the interview

14

should not have resumed after he requested a lawyer.  But that is not the law.  *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) (holding that, after an accused who has been read his *Miranda* rights requests an attorney, law enforcement must stop questioning "unless the accused himself initiates further communication, exchanges, or conversations with the police"); *see, e.g.*, *Allen v. Filion*, 371 F. Supp. 2d 284, 291 n.5 (W.D.N.Y. 2004) ("[W]hen an accused who has been advised of his *Miranda* rights initially declines to answer questions or requests an attorney but later initiates a conversation with law enforcement officers, even statements made in response to subsequent interrogation are admissible." (citing *Edwards*, 451 U.S. at 484–85)); *United States v. Patchiav*, No. 23-cr-99 (DLI), 2026 WL 638678, at *10 (E.D.N.Y. Mar. 7, 2026) ("It is well settled that a suspect cannot invoke his right to remain silent by refusing to respond to certain questions, but answering others.").

The Court finds that, on this record, Defendant knowingly and willingly waived his *Miranda* rights before making his initial statements during the interview.  As to the statements he made after the interview resumed and he was again advised of his rights, Defendant offers only counsel's conjecture that, after he asserted that he wanted a lawyer, the Government "pressed" the Defendant, resulting in him making further statements in violation of *Miranda*.  *See* Def.'s Mem. at 8.  On this issue, Defendant has not submitted his own affidavit to rebut or contest the Government's factual narrative of the Defendant's interview, to aver he felt "pressed," or to otherwise counter the reasonable inference that his statements were knowing and voluntary.  *See* Gov't's Mem. at 18 n.1; *see United States v. Rogers*, No. 3:24-cr-139 (KAD), 2025 WL 1207503, at *5 (D. Conn. Apr. 5, 2025) ("Indeed, Defendant did not submit a sworn affidavit from Rogers or anyone else to raise a question of fact as to whether Officer Borges was aware of the controlled buy at the time of the vehicle stop.").  This reasonable inference derives from that fact that

Defendant was read his *Miranda* rights by an officer; was provided with a Notice of Rights form, which he signed; and after he resumed talking after requesting a lawyer, he was provided with *another* Advice of Rights form, which he also signed.[5]  "Multiple federal appeals courts have recognized that written *Miranda* waiver forms provide 'strong' evidence that a defendant has voluntarily waived his Miranda rights." *United States v. Santiago*, 709 F. Supp. 3d 65, 70 (D. Conn. 2024) (collecting cases).  And as explained, Defendant has not provided any factual information to rebut that strong evidence of a voluntary *Miranda* waiver.

Defendant's motion to suppress his statements to law enforcement at the Granby Police Department is DENIED.

**Conclusion**

For all of the foregoing reasons, the motion to suppress is DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 14th day of May, 2026.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

[5] Defendant does not contest that both the Notice of Rights and Advice of Rights form adequately apprised Defendant of his *Miranda* rights.

16